**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Stanley YELARDY, Defendant-Appellant.**

**No. 74–2253.**

United States Court of Appeals,
Sixth Circuit.

Argued Dec. 13, 1977.

Decided Feb. 28, 1978.

---

**864**

Gershwin A. Drain, John W. Tapp, Detroit, Mich., for defendant-appellant.

Philip Van Dam, U. S. Atty., Gordon S. Gold, Asst. U. S. Atty., Detroit, Mich., for plaintiff-appellee.

Before PHILLIPS, PECK and MERRITT, Circuit Judges.

MERRITT, Circuit Judge.

Following a bench trial in the United States District Court for the Eastern District of Michigan (Pratt, J.), appellant Yelardy was convicted of one count of possession of an unregistered firearm, in violation of 26 U.S.C. §§ 5861(d) and 5871. He was sentenced to two years' imprisonment to be served consecutively with a federal sentence he had previously received. He appeals on grounds of ineffective assistance of counsel at trial.

There is substantial, unchallenged evidence of Yelardy's guilt. An inmate of the Milan Federal Institution at Milan, Michigan, he was permitted to attend daytime classes at the University of Michigan nearby. On August 27, 1973, three masked bandits robbed the University Branch of the Michigan National Bank in East Lansing, Michigan. Yelardy and two other inmates participating in the study release program, Roberts and Williams, were arrested the following day and eventually charged and convicted of the robbery. We affirmed the convictions on appeal, *United States v. Roberts,* 548 F.2d 665 (6th Cir.), *cert. denied,* 431 U.S. 931, 97 S.Ct. 2636, 53 L.Ed.2d 246 (1977).

Shortly after the robbery, federal agents obtained and executed a warrant to search an apartment leased to a woman named Melvia Miller. Under the mattress of the bed, the agents found an unregistered sawed-off shotgun. Although there were no fingerprints on the gun itself, one print identified as Yelardy's was found on a shell loaded in the gun. Agents also seized photographs of Yelardy, his checkbook, and receipts for furniture purchased in his name. The agents found no woman's clothes or cooking utensils in the apartment.

The manager of the apartment complex testified that, although Miller had signed the lease and paid for the apartment, he had never seen Miller in the apartment and discussed all problems concerning utilities, parking, and decorating with Yelardy.

During the month between Miller's renting the apartment and the bank robbery, the manager saw Yelardy twice in the driveway and once in the apartment. He never saw Miller or anyone but Yelardy enter the apartment.

In addition Jeffrey Rockman, another inmate at Milan, testified that he regularly drove Yelardy, Roberts and Williams, from the Milan prison to the university and back. In Rockman's presence, the others discussed obtaining a sawed-off shotgun. Yelardy also said he wanted to obtain an apartment in the complex where Miller later rented a unit; and, a few weeks afterwards, Yelardy gave Rockman a telephone number and told him that he had rented an apartment in the complex.

The sole issue raised on appeal is whether Yelardy received effective assistance of counsel at trial. Following an examination of the record, we initially remanded the case to the district court for a factual hearing on appellant's claim. Following this hearing, the court below issued detailed findings of fact and, applying the standard we prescribed in *Beasley v. United States,* 491 F.2d 687 (6th Cir. 1974), concluded that Yelardy had not been deprived of his Sixth Amendment right to counsel. We affirm that judgment.

As found by the District Court, Yelardy was represented by experienced, retained counsel. During conversations with his attorney, Yelardy admitted some culpability in the bank robbery and acknowledged control over the shotgun found in Miller's apartment. He also implicated Miller in these wrongdoings but asked counsel to contact her. Counsel telephoned Miller but found her to be an unwilling and unhelpful witness.

Prior to trial, defense counsel inspected, by agreement with the prosecuting attorney, all the evidence against Yelardy (Tr. 6–7). Counsel also filed a motion to suppress evidence obtained from the search but withdrew the motion before trial because he did not believe that it would be granted.

■ While we question defense counsel's failure to persevere in his challenge to the warrant[1] or to investigate more thoroughly the circumstances surrounding Yelardy's use of Miller's apartment,[2] our evaluation of appellant's Sixth Amendment claim turns "not on a mere assessment of particular missteps or omissions by counsel, whether or not caused by negligence . . . but on the District Court's evaluation of the total picture, with the objective of determining whether petitioner was deprived of rudimentary legal assistance," *Chambers v. Maroney,* 399 U.S. 42, 60, 90 S.Ct. 1975, 1985, 26 L.Ed.2d 419 (1970) (Harlan, J., concurring in part and dissenting in part).

1. The warrant here at issue was challenged and recently upheld by this Court in affirming Yelardy's conviction of the bank robbery charge, *United States v. Roberts, supra,* 548 F.2d at 668. The government conceded that some of the statements in the supporting affidavits were untrue. Following a pretrial hearing at which Miller testified, the district court ruled, and we agreed, that the errors were not made in bad faith and were, in any event, not material to the determination of probable cause.

   While, as we stated in *Beasley,* the harmless error test is inapplicable to proven claims of ineffective assistance of counsel, the court must first find counsel's performance constitutionally deficient, and that evaluation inevitably turns in large part on the soundness of counsel's legal judgments. In view of our previous decision upholding the validity of the search warrant, it would be strange doctrine to find counsel incompetent because, in part, he accurately assessed his chances of success in challenging the warrant. Although we have rejected the idea that an attorney's errors may be held entirely harmless, they must first be errors.

2. In light of his client's admission of guilt, the evidence in the government's case file, and his conversations with Miller, Roberts and Williams, defense counsel could reasonably conclude that Yelardy's only defense was to put the government to its proof, a burden which the prosecutor discharged thoroughly and convincingly. As a matter of both practical and constitutional significance, we note that counsel's obligation to conduct an independent, factual investigation is substantially diminished once counsel has reasonable cause to believe his client guilty.

█ The touchstone in the vast majority of right-to-counsel cases is the trial record itself.[3] At our request, the district court has again reviewed that record, now supplemented by the evidence of the fact-finding hearing, and determined that defense counsel's decisions before and during trial were reasonable in light of the circumstances of the case as a whole.[4] Our independent review of the record confirms the conclusion that counsel's advice was well "within the range of competence demanded of attorneys in criminal cases." *McMann v. Richardson,* 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970); *Tollett v. Henderson,* 411 U.S. 258, 266, 93 S.Ct. 1602, 36 L.Ed.2d 235 (1973). Yelardy's conviction is, therefore, affirmed.

PECK, Circuit Judge, dissenting.

I respectfully dissent because I cannot agree that appellant was accorded effective assistance of counsel. It is never easy to charge a lawyer with failing to fulfill his professional duty to render reasonably effective assistance to an accused. Nonetheless, a defendant is constitutionally entitled to such assistance, and no amount of "substantial unchallenged evidence of guilt" (emphasized by the majority) can diminish that right in any way. While the majority relies on the fact that "counsel inspected, by agreement with the prosecuting attorney, all the evidence against Yelardy," this occurred, at best, the day before trial, far too late to line up evidence or witnesses to rebut the Government's case. It is not unfair to say that this is the reason that the Government's evidence went "unchallenged."

The errors and omissions committed by trial counsel are too numerous to detail. It is worth noting, however, that the only evidence that counsel did anything at all to earn his $2500 fee during the ten months before trial is his own testimony at the evidentiary hearing. That evidence is weak enough, considering the fact that he could remember almost nothing about his preparation for the case, but when it is balanced against the contrary testimony not only of the accused (admittedly somewhat suspect) but a sworn affidavit from a potential witness, and conflicting statements by the attorney himself to the Michigan State Bar Grievance Board, it strains credulity to accept the position that Yelardy's attorney prepared for trial at all, much less in a "reasonably adequate" manner. Perhaps the most compelling "witness" Yelardy had to support his contention that his attorney failed to prepare for trial was his attorney's file on the case, which contained only a few notes scribbled during the trial. It contained no evidence to suggest any preparation at all, no interview notes, no legal research, no details of trial strategy, no copies of the search warrant, no copy of Yelardy's criminal record—nothing.

Under the majority opinion, it would seem that unless a lawyer is willing to stand up and admit failure to prepare for trial, no challenge can successfully be made to inadequate representation during this crucial stage of the criminal defense. It is rare that incompetence is reflected in the transcript of the trial itself; failure to perform professional obligations during the weeks and months before trial do not appear in the record. But a defendant is constitutionally entitled to counsel both

---

3. As Yelardy conceded in his initial brief, "A reading of the trial transcript would not necessarily suggest ineffective assistance of counsel" (Brief for Appellant at 23).

4. "Under our adversary system of justice," moreover, " . . . the vast array of trial decisions, strategic and tactical, which must be made before and during the trial rests with the accused and his attorney," *Estelle v. Williams,* 425 U.S. 501, 512, 96 S.Ct. 1691, 1697, 48

L.Ed.2d 126 (1976). In those rare instances where counsel's performance is so inept as to implicate the Sixth Amendment's guarantee, "the matter, for the most part, should be left to the good sense and discretion of the trial courts with the admonition that . . . judges should strive to maintain proper standards of performance by attorneys who are representing defendants in criminal cases in their courts," *McMann v. Richardson,* 397 U.S. 759, 771, 90 S.Ct. 1441, 1449, 25 L.Ed.2d 763 (1970).

"reasonably likely to render and rendering reasonably effective assistance," and defense counsel must "investigate all apparently substantial defenses available to the defendant and must assert them in a proper and timely manner." *Beasley v. United States,* 491 F.2d 687, 696 (6th Cir. 1974).

Finally, I find the implications of the majority's comment that "counsel's obligation to conduct an independent, factual investigation is substantially diminished once counsel has reasonable cause to believe his client guilty," disturbing. A lawyer is bound to present every defense the law permits. This obligation is the heart of the adversary process, and it is impossible to discharge that duty without thorough preparation, including factual investigation. It is not the lawyer's role to determine a client's guilt or innocence, and "reasonable cause to believe" a client guilty cannot ethically affect a lawyer's representation. If the majority is merely suggesting that having a "guilty" client may make gathering the facts easier, that may be true, but the duty to conduct a thorough investigation is not thereby diminished.